May it please the Court, I would request one minute for a bottle of my coffee. Yes. Thank you, Your Honor. This is an appeal from the Grant of Summary Judgment to Biogen at the District Court level on an employment disability discrimination case brought by my client, Dr. Mark Brader. District Court here failed to draw all reasonable inferences in favor of Dr. Brader as the applicable standard of summary judgment demands. Unfortunately, instead of noting genuine issues of material fact precluding entry of summary judgment, District Court engaged in fact-finding to make determinations of evidence. Counsel, you know, that's the usual argument we hear when there's summary judgment. It isn't really very helpful to us. Let's step back, please. Sure. One question is whether this is simply a termination case or whether the trial court was wrong in saying you essentially don't get the advantages of the continuing violation. Let's assume the trial judge was right on continuing violation. And let's assume that we're talking only about the reduction in force decision. All right? So one could look at it as, well, ultimately you would have to show that the employer's reason was pretextual, and on this evidence no reasonable jury could find it was pretext. So could you address that point? Of course, Your Honor. Thank you for focusing the argument here. I believe to answer the question of whether or not the given reason by Biogen is pretextual, it's important to focus on the deposition, testimony, and the evidence we received from Dr. Valdez of Biogen. Dr. Valdez was the head of PPD, which is the department that is the larger envelope where technical development is situated where my client worked. The key to Dr. Valdez' testimony here to show pretext is twofold. One is when he gave us his reason as to why Dr. Brader was included in the reduction in force, which is that they're no longer employing people who had a focus on sort of what they call blue sanitation, we find out that just wasn't true. We find out that within weeks of including Dr. Brader in the reduction in force, Biogen has advertised for two new engineering positions in the crystallization department doing the exact sort of work that Mr. Brader, Dr. Brader, had spearheaded at Biogen. Secondly, he says the reason he was included in the reduction in force, excuse me, another reason why his explanation that he was included in the reduction in force makes no sense is that we also know from his post-doctoral trainee who stayed on after the reduction in force, Dr. Denise Tennell, that not only did Biogen continue to do the crystallization work, which required very specialized skill Dr. Brader had, but they actually increased the time that someone else took over for it. Dr. Damien Howard, who took over the crystallization project, spent even more time on the project than did Dr. Brader. So if the given reason from Biogen is that you were included in the reduction in force simply because we're no longer investing in employees who are on the work of the type that you're working on, it is then shown to be untrue, at least questioned enough that a fact finder should have the opportunity to decide based on the fact that you're not going to continue to work on your prior two positions. The employer says there's a clear distinction between the person they hired and the type of work he was doing and the type of work that your client was doing. I understand that, Your Honor. I don't expect the employer to agree with me that it's the exact same type of work. This is their defense, which is that this was... Yes, but you have to show that that distinction is pretextual. Okay. Not merely that it's wrong. Sure. That it's a pretext for firing him for a discriminatory reason. Absolutely. It's often been said, Your Honor, that's also the clever man discriminating in clever ways. There's never going to be a smoking gun in this sort of case. What I suggest to the court is that the evidence of pretext is that when Biogen, through Dr. Galdez, gives us a specific reason why he's fired and then hired two more people to do exactly what he was doing, that is evidence of the pretext. But they say it wasn't exactly. I understand, Your Honor. I'm getting to that. And what is your evidence that it was exactly? The evidence that it was exactly is the deposition testimony of both Dr. Galdez and Dr. Brayer. When we go through and actually pinpoint what was different about these positions, we learn that Dr. Galdez's testimony doesn't stand up, doesn't hold water. They were requiring the exact same expertise in terms of chemistry, Ph.D. They required work in the crystallization project, which is in Cambridge, even though Dr. Galdez claims the deposition was for the plants in South Carolina. They advertised for a job for a senior manufacturing engineer to work on small molecules. That was not what your client was doing. He absolutely was, Your Honor. But now he's a research scientist studying proteins. I understand. You may think they're the same thing, but to the outside world, it doesn't sound like the same thing. Respectfully, Your Honor, while he was a research scientist primarily within the TD group, he was flagged through OTI, this separate group that Dr. Galdez also spearheaded, as having this crystallization concept that was sort of a blue sky, new big deal. Yes, but he's a research scientist pursuing one aspect of crystallization. The other guy they hire is an operational engineer working on other aspects of crystallization. Why should they be considered the same thing? Well, with due respect, Your Honor, I suggest it's a question of fact that should be parsed through by a fact finder after hearing all the evidence, whether or not it is or is not the same, whether or not you can link to an engineer actually makes a difference than the work that Dr. Brady was doing while he was at Biogen. While he was indeed titled a research scientist, the whole crux, his claim is that the whole gravamen of this sort of animosity he started feeling, the harassment he started feeling, was because of his breakthrough work on this crystallization concept. So the company is undergoing a reduction in force, right? So they have to make some assessments about whether they're going to, where they're going to take the cutbacks. Doesn't it make sense to take cutbacks in research about what may or may not someday become a new product for the company? I didn't mean that, Your Honor. Okay. So if that's so, we agree it makes sense. You may disagree that that's an accurate statement, but we agree that makes sense. If that makes sense, what's the evidence that the motive here was discrimination? The evidence that the motive here was discrimination is that up to the mental disability that he experienced at work in June 2014, which was later diagnosed as bipolar disorder, Dr. Brader never had even as much as a negative sort of comment on his reviews. He was an exceptional employee for many years. All of his most recent review that happened just before his mental breakdown actually gave him the reading of exceptional, which is withheld to a very small percentage of Biogen employees. So if you take the fact that Dr. Brader has always been an exceptional employee, you couple it with the fact that he had spearheaded this crystallization project which required his very unique expertise, and then you couple that, lastly, with Biogen's stated reason for terminating him or including him in the reduction of force, which is we're not going to do that kind of work anymore, only to see that they actually are hiring two more people afterwards to continue that kind of work. Okay. Thank you. Counsel, very quickly, Dr. Gaudese, if I pronounced that correctly, he made the sole decision to include your client on the termination list. I understand that's the assertion, and that he had no awareness of the mental health issues that your client had, and hence the argument would be that that mental health history could not have factored into his decision. You suggest that the record belies that assertion. Can you just very briefly elaborate on that? Absolutely, Your Honor. If you look at the e-mails my client sent, June 30th and the week afterwards, throughout July 7, 2014, when he experienced his very public, breathless ability at work, the e-mails are all, maybe with the exception of one, all directed to Dr. Gaudese as one of the recipients. So unless he was ignoring multiple e-mails coming in from my client, where he very clearly says, very embarrassingly to him, that I am in a mental hospital, I am, for lack of a better word, in the cuckoo's nest, I need help. He makes those statements in those e-mails that you say that Dr. Gaudese received? Absolutely, Your Honor. And I suggest the court looked at those e-mails, because there are a lot of them, and they're in the record. But it couldn't be any clearer that unless you were ignoring every single one of those e-mails, this employee is having a mental breakdown. And if you look, one more second, Your Honor, if you give me one more minute, if you look at the deposition testimony from Dr. Gaudese, it even makes it more obvious that he's trying to act like he doesn't know what's going on, because you've got a man with a 20-year history, a neuroscientist, a biogen, claiming that when he saw e-mails coming in to him, he just assumed that it might have been some sort of, what do you say, infection, back to sort of what had happened previously. Well, that is the explanation that his wife explicitly offered to the company, was it not? Well, at one point when this first happened, so the doctors were suggesting this might have some sort of connection from withdrawal of medicine from the back surgery, but it was never a this is caused by the back surgery. And if you look at the HPQQ form, which is the form that was submitted immediately afterwards by his health care provider's biogen, it clearly comes from a psychiatrist, and it clearly indicates the man has mental disability that he's suffering from, which is why he's out of work. Thank you. Thank you, Your Honor. May it please the Court. Jonathan Shank from the appellee Biogen, Inc. Your Honors, this case stems from Biogen's decision to include Dr. Brader in a large corporate restructuring in November 2015, which impacted 11% of the company's workforce. Now, Dr. Brader speculates that his inclusion in this restructuring was somehow discriminatory and retaliatory. However, that speculation is not a substitute for actual evidence, and there's not a shred of evidence anywhere in the record to support these claims. What was the difference between the work that Dr. Brader was doing and the person hired subsequent to his departure was doing? The difference, Your Honor, is first of all there were two positions that were posted that Dr. Brader refers to. One of them, and neither one of the positions, is remotely similar to the work that Dr. Brader did as a principal scientist at Biogen. Was it involved in this crystallization project? I believe the positions did continue the work in that crystallization project, but Biogen never informed Dr. Brader, as my brother represented it, that the work on that project was going to stop when he was let go. Biogen made a decision to restructure their resources and allocate resources at the company. But getting back to Your Honor's question, one position that Biogen posted was for a co-op student, which is to work on this research, which is obviously not remotely similar to Dr. Brader's position as a principal scientist. And the other position was working on, as Your Honor mentioned, small molecules not focused on protein. It was more of an engineering position. So the positions were not, while a component of that role did look at the crystallization research, they were not the same positions at all, Your Honor. Before I get into Dr. Brader's layout, I quickly want to address some of the other alleged adverse actions. Any claim based on these alleged adverse actions is very clearly time-barred, and as the district court recognized, the continuing violation doctrine does not rescue those time-barred claims. Even if the court were to consider the time-barred actions, summary judgment would still be appropriate. With respect to Biogen's decision not to promote Dr. Brader, it's undisputed that he made a presentation to senior leadership on June 18, 2014, and the very next day a promotion meeting was held. It's also undisputed that Dr. Brader did not receive the promotion. This decision was made before Dr. Brader even alleges that he was disabled or perceived to be disabled. So it's clear that that decision did not form the basis of any claim of disability discrimination. Ken, could you provide some information in response to the topic that Judge Lopez just inquired about, which is whether the decision-maker actually had knowledge of the mental disability diagnosis that the plaintiff had suffered some years before? It's undisputed, Your Honor, that in late June 2014 and early July 2014, Dr. Galvez was CC'd among numerous other executives and people at Biogen on a number of emails from Dr. Brader that were in large part incoherent. Dr. Brader went on a leave of absence on July 1, 2014. Shortly thereafter, as Your Honor mentioned, Dr. Brader's wife informed Biogen that Dr. Brader's condition was, quote, temporary and caused by a reaction by a temporary infection that was caused by some type of reaction to medication. That's the only evidence in the record about Dr. Brader's condition. And further, Dr. Brader's medical provider submitted a form that mentioned that the impairment began after this surgery. There's no evidence in the record that Dr. Galvez, when he made the decision to include Dr. Brader in the restructuring, considered these emails that he sent. In fact, Dr. Galvez testified to the contrary. He did not consider Dr. Brader to be disabled, and the only knowledge he had was that he did have this temporary infection, which was cleared by the time Dr. Brader returned to work in October 2014. At least on that issue, why isn't there, it certainly sounds like a material issue in this case, was Dr. Galvez aware of the mental issues of Dr. Brader? And the opposing argument is that there are emails that went to his attention so that it's simply not credible when he says he didn't know about it when he was a recipient of emails which reflect or actually explicitly describe his mental problems. And that sounds like a genuine issue of material fact. There's no dispute that Dr. Galvez was copied on those emails. It's also undisputed that Dr. Brader never contended that he was disabled when he returned to work in October 2014, and he remained employed at Biogen for another year. He never mentioned any type of disability. He never informed Dr. Galvez that he was disabled, that he needed an accommodation. These emails were sent in late June, early July 2014. He went out on a brief leave of absence and returned to work shortly thereafter, a few months later, and never mentioned any type of disability, any type of mental health issues again. So the point is not a denial of receipt of the emails, which, had that happened, might have been a jury issue. The point is that Dr. Galvez said, I did not consider him to be disabled, and that didn't factor into my decision in any event. That's correct, Your Honor. I think it's another important point to note that Dr. Galvez is Dr. Brader's boss's boss's boss, and he's making a decision about this large restructuring that's going to impact a number of employees at the company. And Dr. Galvez made that decision without speaking to Dr. Brader's direct boss, Dr. Weiskopf, and Dr. Weiskopf's boss, Mrs. Ballinger, who were more involved with Dr. Brader when this episode in late June was going on. It's also important to note that Dr. Galvez included Dr. Brader's postdoc student in the restructuring as well. The student did not have any type of mental health issues, any type of alleged disability. And he also included approximately 25 other members of the technical development department in the restructuring. So Dr. Brader is unable to offer any type of evidence to support these claims, and he merely speculates that that decision had something to do with, that his episode in June 2014 had something to do with Dr. Galvez's decision. But there's simply no evidence in the record to support that. Dr. Brader simply disagrees with Biogen's business decision that Dr. Galvez made, that this was not going to be a continued area of focus going forward, and they were going to consolidate resources. But once again, this court has repeatedly held that that type of disagreement with Biogen's business decision is not actual evidence of pretext. I should probably ask opposing counsel this question, but I suspect he'll be glad to answer it. Is there any evidence putting in issue Dr. Galvez's assertion that he alone created the list of individuals who would be terminated, that no one else such as Dr. Weisskopf, for example, with whom Mr. Brader had all these issues, that Dr. Weisskopf and others with whom Mr. Brader interacted, they had nothing to do with creation of this termination list? That fact is undisputed, Your Honor. Was Dr. Galvez ever asked if he had any conversations with Weisskopf about Biogen? About, I'm sorry, Your Honor. About the appellant. Dr. Brader testified that he did not have any conversations with Dr. Weisskopf, who was Dr. Brader's supervisor, and Ms. Ballinger, who was the other supervisor, that he alone made the decision to include Dr. Brader in the restructuring without discussing that fact with anyone else at the company. No, I understand that that's your assertion, but was he ever asked if he had any discussions with him about the state of his health? Whether Dr. Galvez ever discussed, I don't believe he was ever asked that, and I don't think there's any evidence in the record to suggest that, Your Honor. Quickly, addressing Dr. Brader's retaliation claim, as the district court concluded, Dr. Brader never complained. While he made a number of complaints in late June, early July, he never complained that he was being discriminated against because of his alleged disability in any way. What he complained about was disagreements with feedback that he received about his performance, specifically critiques he received about this presentation that he gave in late June 2014. Those complaints do not constitute protected conduct for purposes of retaliation claim, and even if the court considered— Well, counsel, he did request an accommodation, did he not, in the form of, I guess, allowing him to take vacation time so he could ease his transition back to work, and that kind of accommodation could be the basis, arguably, for retaliation, could it not? That's—it's correct that he did request. That was the only accommodation that he did request on the moment of absence, and Biogen granted that request. Right. Even assuming that is the requisite protected conduct, it's not. But even though he granted it, it doesn't mean that they could be immune from a retaliation claim, right? Your Honor, I would suggest that there's not sufficient evidence of any causal connection in the record. That request for accommodation was made when he returned to work in October 2014. Dr. Brader—or Dr. Galvez made the decision to include Dr. Brader in the restructuring almost a year later, in September 2015, so I suggest that it's not close in time, and there's no other evidence in the record that Dr. Galvez made the decision for any type of retaliatory motive. Thank you. Thank you, Your Honor. Mr. Weltman, you have one minute. Thank you, Your Honor. Just to answer the question that was posed to my brother more directly, Dr. Galvez was not solely responsible for making the decision with respect to Dr. Brader. His testimony is very clear. He assembled a team consisting of Michael Kaufman, who's the vice president at Biogen, Rohan Matra, who's the vice president at Biogen, and a PPD human resources representative, Mrs. Guth. He also testified that they met multiple times before finalizing the list. Dr. Kaufman— I'm sorry, did any of those people on the team get those emails? Yes. Thank you for asking that question. Dr. Kaufman and Dr. Matra, to be more specific, were very familiar with the crystallization concept, and whether or not Mr. Kaufman and Rohan Matra themselves got the emails. My understanding is that an HR representative was included in those emails. I have to look back at them in the record. But certainly it wasn't just Dr. Galvez receiving these emails. Going back to my point, though, I should real quickly, Dr. Kaufman and Dr. Matra, who also were in this group deciding the RIF, were very familiar with Dr. Brader's crystallization work. They were very familiar with his acute mental health episode, and Mrs. Guth herself was actually informed and directly involved in Brader's renewed complaints about a supervisor following harassment in his mid-year 2015 feedback. I know you don't want to talk about continuing violations, but just to sort of dovetail that last point, Dr. Galvez wasn't the sole decision maker. He had input from people who were more than familiar with Dr. Brader's mental health condition and his work with crystallization. So then to later say that he had no idea that he had a mental health issue and had no idea he was working on crystallization belies what the actual testimony is. Okay, counsel. Thank you.